1
2
3
4

Darryl Carter
1822 Young Street
Dallas, TX 75201
Phone: (469) 783-0382
Email: access2courts@posteo.org

5

Attorney for PLAINTIFF

6
7

# UNITED STATES DISTRICT COURT

8

# FOR THE NORTHER DISTRICT OF TEXAS

9
10
11

# DALLAS DIVISION

12
13

DARRYL CARTER,

14

            Plaintiff,

15

        vs.

16
17

DALLAS POLICE DEPARTMENT;
OFFICER A. HUGHS IN HIS
OFFICIAL CAPACITY

18
19

            Defendants.

Case No.:

**COMPLAINT FOR INJUNCTIVE RELIEF**

U.S. Constitution Amendment I (Freedom of Speech);

U.S. Constitution Amendment VIII (Cruel and Unusual Punishment);

28 U.S.C. § 2201

20
21
22
23
24
25
26
27
28

1
**COMPLAINT FOR INJUNCTIVE RELIEF**

1
2
3
4
5
6

TABLE OF CONTENTS

PARTIES.................................................................................................................2

JURISDICTION AND VENUE...............................................................................3

FACTUAL BACKGROUND....................................................................................3

CAUSES OF ACTION............................................................................................6

   COUNT I
   (U.S. Constitution Amendments I, VIII, XIV)
   (Declaratory Relief; Injunctive Relief)................................................................6

PRAYER...............................................................................................................13

## PARTIES

1.

Defendant Dallas Police Department is a local police agency whose police headquarters address is located at 1400 S. Lamar Street, Dallas, TX 75215.

Defendant Officer A. Hughs is an officer of the Dallas Police Department and an officer present during the incident and matters giving rise to this herein complaint. Defendant A. Hugh's official address is likewise located at 1400 S. Lamar Street, Dallas, TX 75215 and is, also, the address listed on the "Service Assistance Information" Slip identifying case# 021183-2020 as handed to plaintiff.

2.

Plaintiff Darryl C. Carter is the plaintiff in this action whose address for the purposes of this action is: 1822 Young Street, Dallas, TX 75201.

3.

2

**COMPLAINT FOR INJUNCTIVE RELIEF**

1
2
3
4
5
6

Upon information and belief, defendants DOES 1-15 work at or are employed at, by, or through the federal government in an unknown capacity and are believed to have played a role in the events specific to this action likely through the use of illegal spying and surveillance and a retaliatory response to plaintiff forwarding correspondence to Congress just hours prior to the police events and incident giving rise to this action.

7
8

## JURISDICTION AND VENUE

9

4.

10
11

Plaintiff brings this action per the United States Constitution incorporating the Bill of Rights with emphasis on the First, Eight, and Fourteenth Amendments.

12

5.

13
14
15
16

Furthermore, this court is appropriate with respect to venue as the violations and harm complained of, as set forth herein, against plaintiff occurred in this district. Furthermore, and defendants Dallas Police Department and Officer A. Hughs have their principal office/address located in this judicial district.

17
18

## FACTUAL BACKGROUND

19

6.

20
21
22
23
24
25

At precisely 4:12 am on February 1, 2020 plaintiff was approached by a person by the name of A. Franklin claiming to be employed by the Transportation Security Administration hereinafter ("TSA") at which time A. Franklin advised plaintiff that he could not sleep on the flat bed or bench provided by Dallas Love Field Airport for the public in the designated TSA public area. A. Franklin was accompanied by a heavy stout looking black female who initially did not speak.

26
27
28

7.

3

**COMPLAINT FOR INJUNCTIVE RELIEF**

1        At the same time, 4:12 am on February 1, 2020 when plaintiff was
2   approached by A. Franklin as set forth, ante, there were several other individuals
3   resting on other benches or flat beds provided by Dallas Love Field Airport for the
4   public in the designated TSA public area.

5                                               8.

6
7        Approximately 3-5 minutes passed from the time of 4:12 am when A.
8   Franklin first approached plaintiff as set forth, ante, at which time, now 4:15 – 4:17
9   am when an officer, later discovered as Officer A. Hughs is in a very hostile
10  position (physically standing over plaintiff such that plaintiff could not move
11  freely) and tone stated, "You need to get out of here now." Officer A. Hughs goes
12  on to state, "Gimmie your ID." Plaintiff did not provide an ID.

13                                              9.

14       At this time two (2) other officers by the name of M. Bullocks purportedly
15  badge number 9635 (or possibly 9633), and officer J. Vahn purportedly badge
16  number 8299. Officer J. Vahn was the supervising officer on the other two (2)
17  officers on the scene.

18                                              10.

19
20       Plaintiff, speaking to officer M. Bullocks inquired why plaintiff was "being
21  singled out, when all those people over there are sleeping on benches or flat beds?"
22  Officer M. Bullocks replied, "I think they asked the one (black) lady also but that
23  lady got up quickly and leaved before we arrived. That lady knows the game; she
24  did not make a scene and ask questions; she just got up and left quickly. So you
25  know, that (black) lady she can come back again tonight because she left so
26  quickly before we could issue her a warning. She knows the game. You should
27  have done like that (black) lady.") Plaintiff replied that he had seen at least four of

28

---

4

**COMPLAINT FOR INJUNCTIVE RELIEF**

the the other individuals, also, sleeping on the benches or flat beds for quite some time.

11.

At the time, following item #10 above, plaintiff is talking with officer M. Bullocks plaintiff noticed that there was an Asian family on the very last bench or flat bed. At no time did any officer on the scene nor any person employed with TSA, ever inquire anything to the Asian family on the very last bench. Furthermore, at no time did any officer on the scene nor TSA employee ever inquiry, anything, to the other three (3) individuals sleeping on the benches for flat beds. In fact, at no point did any officer nor TSA employee inquire as the (black) lady sleeping in the lounge chair and her possessions propped up on one of the benches or flat beds, until plaintiff inquired to A. Franklin allegedly employed with the TSA "Why did not say anything to here?"

12.

At this time A. Franklin employed with the TSA as set forth, ante, states to plaintiff and I quote, "You are not welcome here and you cannot come back here."

13.

At this time, immediately following item #12, above, officer M. Bullocks is requesting my name and date of birth as such was not provided to officer A. Hughs (nor any other officer or person on the scene). Plaintiff went to his cellphone and showed officer M. Bullocks a document with his full name. Plaintiff, also, provided officer M. Bullocks with his date of birth. Shortly there after, officer M. Bullocks provided plaintiff with a "Service Assistance Information" pre-printed slip with a newly generated handwritten case #021183-2020. Plaintiff specifically and specifically advised officer M. Bullocks that, "I will be filing for an injunction in court," in the presence of officer A. Hughs and J. Vahn while they listened in on

5

**COMPLAINT FOR INJUNCTIVE RELIEF**

the situation. Officer M. Bullocks replied, "That is what the legal system is there for." Plaintiff replied, "You guys do not think I know what is going on here and that I have been singled out in violation of my constitutional rights and that I do know why this was done. I know you guys watch those camera all day everyday." Officer M. Bullocks replied, "We (officers) are not here 24/7 TSA are the ones that watched you [via A. Franklin and the black mute woman accompanying A. Franklin to the scene giving rise to this action], they are the ones that called us to the scene. They know there reasons for why they have now called us to the scene."

14.

Plaintiff assembled his blanket and pillow which was given to him, freely, a few nights prior and was escorted to the front door by officer M. Bullocks. Officer Bullocks advised plaintiff that "If you come back here they can have you arrested on the spot."

# CAUSES OF ACTION
## COUNT I
**(U.S. CONSTITUTION AMENDMENTS I, VIII, XIV)**
**(DECLARATORY RELIEF; INJUNCTIVE RELIEF)**
**(Asserted Against Dallas Police Department and Officer A. Hughs)**

15.

Plaintiff alleges and incorporates ¶¶ 1-14 as though fully set forth herein.

16.

Plaintiff has been occupying a public space at the Dallas Love Field airport quietly, without disturbance, nuisance or incident of any kind for the better of two (2) weeks without even a single word from any person i.e. police officer or TSA

**COMPLAINT FOR INJUNCTIVE RELIEF**

employee with respect to his occupancy of said space being a bench or flat bed provided by the Dallas Love Field airport which all others occupy form time to time. In fact, since plaintiff began occupying this space he has consistently seen several other individuals occupying the same space (area) over the same period of time also without incident. In fact, on or around January 16, 2019 at around 12:30 am., a Dallas Love Field employee provided plaintiff with a standard issuance grey six (6) foot long, 3.5 foot wide blanket and a pillow for sleeping. After issuance of said blanket and pillow, plaintiff used the same for reoccurring visits. At all times during which plaintiff occupied said designated public space it was during the hours of 8:00 pm through 7:00 am (sometimes arriving later but virtually never leaving later than 7:00 am).

17.

Both TSA in general and the Dallas Police Department knew that plaintiff occupied this space for sometime without even a word from either entity which officer M. Bullocks even stated, "They let you stay here for two (2) weeks." Furthermore, the area in question has several video cameras which officer M. Bullocks acknowledged are monitored around the clock i.e. 24 hours a day including weekends and holidays.

18.

7

**COMPLAINT FOR INJUNCTIVE RELIEF**

On January 31, 2020 at approximately 4:00 pm., plaintiff sent correspondence to Congressman Lewis at his local office versus his Washington D.C. Office. See **Exhibit A**, attached hereto. In said correspondence to Congressman Lewis, plaintiff complained of issues with malfeasance and official misconduct involving federal actors. See **Exhibit A**, attached hereto. Specifically and relevant here are plaintiff's complaints of abuse of power, illegal surveillance and domestic spying utilized illegal to obtain secret information as to plaintiff's moves such as quash his efforts before they got off the ground. These illegal activities require a special level of clearance and access not readily available to regular government employees and plaintiff laid out a case in the letter to Congressman Lewis, that such was highly likely to be occurring within the United States Department of Justice hereinafter ("U.S.D.O.J") and/or its subordinate division being the Federal Bureau of Investigations hereinafter ("F.B.I") and/or at high judiciary levels i.e. federal circuit court level and/or above.

19.

*Within 12 hours of plaintiff's correspondence to Congressman Lewis, plaintiff was approached by officer A. Hughs, and A. Franklin a TSA employee* as set forth, ante, which incident gives rise to this complaint. Furthermore, in the underlying Congressional correspondence, plaintiff complained of illegal intercepting, routing, and misdirection by the United States Postal Service

8

**COMPLAINT FOR INJUNCTIVE RELIEF**

hereinafter ("U.S.P.S"). Plaintiff believes the U.S.P.S illegally, again, intercepted his correspondence and routed to one or more federal actors as set forth, ante, as a retaliatory response to plaintiff's freedom of speech right to communicate with elected officials who sit on one or more congressional sub-committees related to plaintiff's underlying issue(s). The named Defendants, Dallas Police Department and officer A. Hughs were instructed or otherwise directed by one or more of said federal actors to make trouble for plaintiff and have him arrested or threatened with arrest as a consequence of plaintiff's correspondence to Congressman Lewis. See **Exhibit A**, attached hereto.

20.

Defendants knew plaintiff was in a vulnerable position as they were instructed so by one or more federal actors and sought to make trouble for plaintiff and thus relegate him to the streets for exercising his first amendment right with respect to plaintiff's multiple correspondences to Congress. Furthermore, A. Franklin is neither an owner nor authorized representative of the owner which officer M. Bullocks acknowledged the building (airport) is owned by the city of Dallas; A. Franklin is merely a federal employee of the TSA. Thus, defendant's had no legal right (foundation) to threaten plaintiff with criminal sanctions (criminal trespassing) or escort him off the premises. Even if, A. Franklin could be said to be an authorized representative, of the owner, which would be a novel

**COMPLAINT FOR INJUNCTIVE RELIEF**

issues addressed nowhere in case law, defendant's acknowledged plaintiff was occupying this space for the better of two (2) weeks without a word from anyone.

21.

In fact, it was not until plaintiff's letter to Congressman Lewis did this incident arise. Thus, it is a highly probable that the substance of plaintiff's correspondence to Congressman Lewis was offensive to one or more individuals (whether federal or state) at which time, following illegal interception of plaintiff's correspondence to Congressman Lewis (which the Congressman has not yet even received), the Dallas Police Department was directed to make trouble for plaintiff in the form of arrest or threat of arrest. Furthermore, it is even more likely that plaintiff's correspondence to Congressman Lewis offended said ghost-phantom-DOE individuals as plaintiff spoke in rash detail of abuse of power, and white supremacy as the motive for plaintiff's complaint to Congressman Lewis. Furthermore, white supremacy has, always, at least since the past 243 years always involved individuals of color with very low intelligence who believed themselves better than other Negros i.e. the House Negro or the riddled with fear Negro so afraid of his Caucasian superiors such that the Negro thought himself currying favor with "Master" by doing "Master's" bidding. Plaintiff believes officer A. Hughs represents exactly such Negro who advances white supremacy through these herein actions, which clearly show an element of retaliation or simply did not

**COMPLAINT FOR INJUNCTIVE RELIEF**

meet the requisite elements to constitute criminal trespass. Furthermore, officer A. Hughs apparently could not and did not speak proper English, and given plaintiff does not speak Ebonics, plaintiff had a difficult time understanding officer A. Hughs.

22.

Thus, the situation of the three (3) Negro officers coming to the scene of black male resting in a designated resting area of Dallas Love Field, which was known and permitted for two (2) weeks (notwithstanding Dallas had over 200 murders in the city the majority of which unsolved and a number of which involving excessive use of force which could have and should have been prevented, only one of which involving a officer ten (10) prison term), without a single solitary word or incident  until plaintiff sent his correspondence to Congressman Lewis just twelve (12) hours earlier. The purpose of using these three (3) scapegoat Negro officer was to offset any claim of race misconduct if the situation went south (pun intended) i.e. low intellect subservient Negros happily accepting their role to advancing white supremacy. Adding insult to injury, Dallas Love Field security screening, for departing patron, is closed each day from 12:30 am through 4:30 am., whereas this incident occurred prior to the passenger security screening hours.

23.

11

**COMPLAINT FOR INJUNCTIVE RELIEF**

Defendant's threat of arrest and issuance of a citation without due process and to advancing white supremacy was in direct violation of plaintiff's constitutional rights as this cause of action outlines in the header. Defendant's knew they were violating plaintiff's constitutional rights, as set forth, ante and even if not specifically directed to do so, they should have known there actions and behavior where in tension with plaintiff's constitutional rights. Conversely, plaintiff's actions with respect to occupying the said premises offended no one for if so, it is reasonable to presume that some other action would have been taken during the prior two (2) weeks rather than wait until twelve (12) hours after plaintiff sent a correspondence to Congressman Lewis.

24.

Plaintiff seeks a declaration of plaintiff's rights with respect to the continued occupancy of said premises without further incident, as set forth, ante. Furthermore, plaintiff seeks injunctive relief (and proceeding the same -- a temporary restraining order) forbidding further harassment of plaintiff, as set forth, ante. Furthermore, given plaintiff's attempts at obtaining reasonable accommodations have failed; see **Exhibit B**, attached hereto, and that plaintiff has no other reasonable accommodations, he has no other means on par but is fated with a worse scenario such as public streets occupancy which even that is forbidden by the Dallas Police Department with local ordinance i.e. criminalizing

**COMPLAINT FOR INJUNCTIVE RELIEF**

living outside when a person has no other place to go. Such actions by Dallas Police Department are oppressive and systemically, near exclusively, target minorities of African descent, to which protected class plaintiff is a member. Furthermore, this same issue has come before the United States Supreme Court following a ruling in the ninth circuit outlawing criminalizing homelessness as cruel and unusual punishment under the constitution. See *Martin v. City of Boise*, No. 15-35845 (9th Cir. 2019), Certiorari Denied.

# PRAYER

WHEREFORE, Plaintiff prays for judgment against defendants and others as follows:

**Regarding the first claim of relief:**

1. A declaration that plaintiff had been occupying the premises under expressed or implied permission for the better of two (2) weeks without incident of any kind therein establishing a right of continued occupancy under the same conditions expressly outlined herein i.e. hours of occupancy, cleanliness of area, etc.;

2. An order enjoining stated defendant's from any further harassment with respect to plaintiff's occupancy on a temporary basis in the form on a temporary restraining order;

3. An order enjoining stated defendant's from any further harassment with respect to plaintiff's occupancy on preliminary in the form on an injunction

13

**COMPLAINT FOR INJUNCTIVE RELIEF**

until such time as the court can hear the matter further and its relationship with the ninth circuit court's decision substantively related thereto;

4. The right to amend the complaint as discovery may illustrate other individuals or entities involved in the matters giving rise to this complaint;

5. An order for all defendants to pay any and all of plaintiff's costs.

**Regarding all claims for relief:**

1. An order for all defendants to pay any and all of plaintiff's costs pursuant this action, including attorney fees, to the extent incurred, pursuant the work expended for this action.

2. Equitable recovery of plaintiff's time pursuing this action.

3. Any further relief that this Court deems just and proper.

DATED: February 1, 2020                    _____

Darryl Carter

14

**COMPLAINT FOR INJUNCTIVE RELIEF**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT A**
(  8  PAGES INCLUDING THIS PAGE)

January 31, 2020


John Lewis
Congressman
100 Peachtree Street NW, Suite 1920
Atlanta, GA 30303

**VIA USPS CERTIFIED MAIL ARTICLE #7018-1130-0001-8966-5644**

**RE: <u>Oppression, Suppression, and Intentional Violation of Constitutional Rights by the Federal Government</u>**

Dear Congressman Lewis:

While the subject of this correspondence may, at first glance, be startling it nonetheless represents the current state of affairs. Your colleagues were put on notice of this behavior, yet the situation continues with no signs of abating. **VIA USPS CERTIFIED MAIL ARTICLE #7018-1130-0001-8966-5644.** Given your status as a civil rights icon, I trust you can identify with the seriousness of the atrocities as outlined in the communications to Congressman Nadler and Congresswoman Maloney.

There can be no doubt that the behavior of the federal government violates even the basic sanctity, foundation, and existence of life while using government resources (human, computer systems, etc.) to carry out this conduct which represents egregious civil and criminal code. **VIA USPS CERTIFIED MAIL ARTICLE #7018-1130-0001-8966-5644.** Worse even, is the holding out of the U.S.A as an representative of first world status and a beacon of light, hope, and prosperity to external countries who, unbeknownst of the truth, believe what they hear (and read) contrary to reality. First, blacks are not welcomed in this country nor have they been for just under 244[1] years now. **VIA USPS CERTIFIED MAIL ARTICLE #7018-1130-0001-8966-5644.** Second, the love affair the country has with foreign nationals exists, solely and only, so much as such foreign nationals are able and willing to work for pennies on the dollar which U.S.A nationals cannot and are not able to work for the same. **VIA USPS CERTIFIED MAIL ARTICLE #7018-1130-0001-8966-5644.** Furthermore, there is no

---

1  In a correspondence to the Department of State (via the U.S. Embassy) on or around December 18, 2018 there was mention of 400 years. Such was a typographical error as the country is just under 244 years old; however, that statement was meant more so to point to the Magna Carta which predates the declaration of independence and emphasized the abolishing of abuse of power, which ironically is the subject both herein and the correspondence to your colleagues. Unfortunately, the pervasiveness of the extreme hardship and duress related thereto coupled with the living situations under which many of documentation drafted over the course of more than 2 years has an impact on the quality of such correspondence.

shortage of talent or skill set within; but, rather an abundance of white supremacy mentality utilizing economic means to perfect agenda related thereto.

While this situation, here, is a horrible, despicable, reflection of the true America and its willingness (via elected officials who are either part of problem directly or indirectly through the failure to proffer real and meaningful solutions) to hide, deceive, and flat out lie regarding the intentional damage to my life, my relationships (now including the last of which recently toppled), and the continued irreparably harm to my health and overall well-being each and every passing day; **VIA USPS CERTIFIED MAIL ARTICLE #7018-1130-0001-8966-5644** all of this done to save face such as not to disturb the public's illusion as set forth ante. **VIA USPS CERTIFIED MAIL ARTICLE #7018-1130-0001-8966-5644**

Albeit the severity of harm, per this situation, is unquestionably extreme and severe – such just seems to pale in comparison to being attacked by K-9 police dogs, and targeted on the streets by very high pressure water hoses, commissioned for fire fighting as opposed to disrupting assembly of the people and expression of their first amendment right to speak against government corruption, fraud, and abuse of power. **VIA USPS CERTIFIED MAIL ARTICLE #7018-1130-0001-8966-5644.** Such behavior was a norm of the 1960's civil rights era, which many have forgotten and to which the current millennial generation has no concept. **VIA USPS CERTIFIED MAIL ARTICLE #7018-1130-0001-8966-5644.** There is no need to go on about the atrocities of the civil rights era as everyone (at least in my generation) is aware of your direct experience with the civil rights era, where the "Rubber meets the road" **VIA USPS CERTIFIED MAIL ARTICLE #7018-1130-0001-8966-5644** so to speak.

What is of essence here is how this particular situation illustrates that bias, racism, white supremacy and persecution of blacks in this country is alive and well **VIA USPS CERTIFIED MAIL ARTICLE #7018-1130-0001-8966-5644** – only taking on different forms and utilizing, in many cases, more subtle approaches. Personally, I am not aware what experience (if any) your colleagues, as set forth ante, possess with respect to egregious basic life and civil rights violations **VIA USPS CERTIFIED MAIL ARTICLE #7018-1130-0001-8966-5644** which might explain why neither a response has been received nor action witnessed on this end. As a well respected and trusted member of Congress, my hope is you can impart some wisdom with your colleagues as to the ramifications of the continuation of this matter. **VIA USPS CERTIFIED MAIL ARTICLE #7018-1130-0001-8966-5644.**

Rest assured the time to act is now. See the attached **VIA USPS CERTIFIED MAIL ARTICLE #7018-1130-0001-8966-5644** enclosure(s) with respect to the proper and necessary actions that are long past due.

Sincerely

**VIA USPS CERTIFIED MAIL ARTICLE #7018-1130-0001-8966-5644**

_____
Darryl Carter
Encl: Correspondence to Congressman Jerrold Nadler dated January 14, 2020, two (2) pages in length

Page 1 of 2

January 14, 2020


Carolyn B. Maloney
Chairwoman
House Oversight Committee
2157 Rayburn House Office Building
Washington, D.C. 20515

**VIA USPS CERTIFIED MAIL ARTICLE #7015-1730-0000-0177-5428**

**RE: Oppression, Suppression, and Intentional Violation of Constitutional Rights**

Dear Chairwoman Maloney:

As I trust you know or should know, I have attempted to reach your office via several phone calls and electronic communications, none of which have I ever received a reply or response in any way. Thus, note the following:


The federal courts are corrupt, they continue to steal money from me, hide behind hidden dockets. They are illegally monitoring and intercepting my email, my united states postal service mail, they have intercepted mail to the President of the U.S. and actually forged a fake response from the President. All of this can be seen on the federal court docket via case #19-03096-NC in the Northern District of California. As of the time of this message, there are 102 entries on that docket the most pertinent, at this time, are docket entries #87-102. In particular, note the (random) court order Doc #100, which the court stated the case is closed. Thus, **there is no impediment to taking immediate action on this matter**. All of this is being done to impoverish and secretly punish for complaining of the corrupt manufactured courts that predecide cases based on political status, affiliation, wealth, and so forth.

The current puppet magistrate judge is the type of token judge that district judges use to push their hidden agenda(s). I have been impoverished and left for dead overseas to cover up for these judges, I have had everything stolen and taken away from me by these judges, and I have sent mail to the press (which I have a constitutional right to do so) in particular the Associated Press, which they intercepted via hidden back channel communications and orders with the United States Postal Service to protect these corrupt judges and
**VIA USPS CERTIFIED MAIL ARTICLE # 7015-1730-0000-0177-5428**

Page 2 of 2

maintain the false light of the corrupt system, **they have taken over my email addresses: <pa.clp@protonmail.com> and <mdcar38t@protonmail.com>, in an attempt to gain control over the evidence**, they have instituted a fake/false appeal to make it look legitimate but in reality they have clerks in the 9th circuit court that draft false scheduling orders to look legitimate with the intent of deceit, I have been forced into a perpetual state of homelessness and begging for food which they all know about and also on the docket mentioned above, all of this to cover for a fallen corrupt system and its actors at my expense for standing up for my so-called constitutional rights. Lastly, the federal court actors and judges have been and continue to intercept USPS mail to federal legislators (like this correspondence), which is a crime in of itself, to protect these judges from impeachment while they continue to go about irreparably harming me and theft of my assets. This is the real America, the America they do not want the public to know. **I do not have money for food, housing, or winter clothing and these actors continue to interfere with all of my attempts of gaining work, again to cover up for them.** Thus, help is need on this end asap as **I am not going to survive indefinitely under these circumstances as I have repeatedly stated and asserted for sometime.** I have already survived much longer than the the guy (who made it to the front page of CNN) stranded in the Alaska wilderness for three (3) weeks. Conversely, this situation has been going on since April of 2019 when I, regrettably, returned to this country to deal with these legal issues which caused the international nightmare -- the doing of the federal judges and actors as mentioned above. See the enclosed with respect to a letter to the Associated Press that was intercepted by the courts via the USPS. This spying is unprecedented and reflective of a fallen corrupt regime. **DO YOU GET IT? I AM NOT GOING TO SURVIVE INDEFINITELY LIVING ON THE STREETS AND PUBLIC PLACES WHILE THESE CORRUPT COURTS CONTINUE TO PROTECT THEMSELVES BY HARMING ME IN THE PROCESS.**

**VIA USPS CERTIFIED MAIL ARTICLE # 7015-1730-0000-0177-5428**

Sincerely



_____
Darryl Carter

Encl: Correspondence to AP intercepted by the courts, two (2) pages double-sided

January 14, 2020


Jerrold Nadler
Chairman
U.S. House Committee on the Judiciary
2138 Rayburn House Office Building
Washington, D.C. 20515

**VIA USPS CERTIFIED MAIL ARTICLE #7015-1730-0000-0177-5411**

**RE: Oppression, Suppression, and Intentional Violation of Constitutional Rights**

Dear Chairman Nadler:

As I trust you know or should know, I have attempted to reach your office via several electronic communications, none of which have I ever received a reply or response in any way. Thus, note the following:


The federal courts are corrupt, they continue to steal money from me, hide behind hidden dockets. They are illegally monitoring and intercepting my email, my united states postal service mail, they have intercepted mail to the President of the U.S. and actually forged a fake response from the President. All of this can be seen on the federal court docket via case #19-03096-NC in the Northern District of California. As of the time of this message, there are 102 entries on that docket the most pertinent, at this time, are docket entries #87-102. In particular, note the (random) court order Doc #100, which the court stated the case is closed. Thus, **there is no impediment to taking immediate action on this matter**. All of this is being done to impoverish and secretly punish for complaining of the corrupt manufactured courts that predecide cases based on political status, affiliation, wealth, and so forth.

The current puppet magistrate judge is the type of token judge that district judges use to push their hidden agenda(s). I have been impoverished and left for dead overseas to cover up for these judges, I have had everything stolen and taken away from me by these judges, and I have sent mail to the press (which I have a constitutional right to do so) in particular the Associated Press, which they intercepted via hidden back channel communications and orders with the United States Postal Service to protect these corrupt judges and
**VIA USPS CERTIFIED MAIL ARTICLE #7015-1730-0000-0177-5411**

maintain the false light of the corrupt system, **they have taken over my email addresses: <pa.clp@protonmail.com> and <mdcar38t@protonmail.com>, in an attempt to gain control over the evidence**, they have instituted a fake/false appeal to make it look legitimate but in reality they have clerks in the 9th circuit court that draft false scheduling orders to look legitimate with the intent of deceit, I have been forced into a perpetual state of homelessness and begging for food which they all know about and also on the docket mentioned above, all of this to cover for a fallen corrupt system and its actors at my expense for standing up for my so-called constitutional rights. Lastly, the federal court actors and judges have been and continue to intercept USPS mail to federal legislators (like this correspondence), which is a crime in of itself, to protect these judges from impeachment while they continue to go about irreparably harming me and theft of my assets. This is the real America, the America they do not want the public to know. **I do not have money for food, housing, or winter clothing and these actors continue to interfere with all of my attempts of gaining work, again to cover up for them.** Thus, help is need on this end asap as **I am not going to survive indefinitely under these circumstances as I have repeatedly stated and asserted for sometime.** I have already survived much longer than the the guy (who made it to the front page of CNN) stranded in the Alaska wilderness for three (3) weeks. Conversely, this situation has been going on since April of 2019 when I, regrettably, returned to this country to deal with these legal issues which caused the international nightmare -- the doing of the federal judges and actors as mentioned above. See the enclosed with respect to a letter to the Associated Press that was intercepted by the courts via the USPS. This spying is unprecedented and reflective of a fallen corrupt regime. **DO YOU GET IT? I AM NOT GOING TO SURVIVE INDEFINITELY LIVING ON THE STREETS AND PUBLIC  PLACES WHILE THESE CORRUPT COURTS CONTINUE TO PROTECT THEMSELVES BY HARMING ME IN THE PROCESS.**

**VIA USPS CERTIFIED MAIL ARTICLE #7015-1730-0000-0177-5411**

Sincerely

Darryl Carter
Encl: Correspondence to AP intercepted by the courts, two (2) pages double-sided

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT B**
( __49__ PAGES INCLUDING THIS PAGE)

December 18, 2019


Bruce J. Butler
CEO
Union Gospel Mission Dallas
3211 Irving Boulevard
Dallas, TX 75247

VIA ELECTRONIC MAIL TRANSMISSION (brucejbutlercpa@ugmdallas.org; wohara@ugmdallas.org)

**RE: UGM Safety, Health, and Security Issues Requiring Immediate Attention and Corrective Action, Revised December 18, 2019**


Dear Mr. Butler:

Please note this correspondence reaches your attention with respect to the above listed subject matter as outlined below.

1.      **Criminal Threats** - First and foremost, on December 17, 2019 @ approximately 6:50 am I received a criminal threat from one of your patron alleging that, "I need to bring my gun to UGM, so I can blow me a motherfuckers head off." This criminal threat apparently followed an incident, whereas in my attempts to walk around this patron in the hallway as he appeared to stop in transit, only to restart movement, at which time the patron walks into my path causing a direct collision. Let me say again in layman's terms – your patron walks into me, then upset about the same states he needs to bring his gun to UGM to blow a motherfuckers head off. This criminal threat/harassment, occurring on your property, is astounding enough; but, the fact that such apparently stemmed from your patron walking into me is utterly baffling. Then again, the baffling element becomes more apparent, with just a little thought – a significant number (but surely not all) of the patrons at UGM are societal rejects, unwanted anywhere else, and cast aside as a burden for someone else; now, couple that with the overwhelming social skills deficiency, of such individuals, and an image should begin to form.

2.      **Security** - The absence of security addressing overall safety and well-being of patrons/residents at UGM is alarming. No one at UGM is aware whether or not patrons/residents are concealing weapons upon entry onto UGM grounds nor is there any security available to address any incident in the event such were to occur. This

security issue is, even, more alarming and disturbing given the emotional and mental disturbances, of at least some, of UGM patrons who have effectively given up on life[1] caring nothing about themselves nor those around them.

3.    **Illegal Illicit Drug Use** - This one speaks for itself. Why would the house of 'God' have reoccurring incidents of the paramedics appearing onsite (driving up local city costs) to treat individuals overdosing on illegal drugs on UGM property, which I understand involves some street drug named "K2." I must say I was quite bewildered overhearing the "K2" drug use conversation for the first time (since arriving in Texas just a very short time ago) as I never heard of any such drug before let alone the stupor trying to figure out how or why anyone would brag about the deadly/lethal illegal drug's, apparent, street reputation. Perhaps even worse, if the body of man is in fact a 'temple,' why any man would inflict such harm upon himself, in such a way, is beyond me; further compounded by the fact that such is occurring on UGM property which is a – church. This repetitive illegal drug use, and likely sale, on UGM property is a civil nuisance and likely meets the standard for a criminal nuisance. How long does UGM intend to turn a blind eye to this issue?

4.    **Food Poison** – About a week ago, myself and several others complained of a gastrointestinal issue (stomach virus) stemmed from a couple of factors: 1.) apparently one of the new cooks at UGM became ill and vomited near the food preparation area; 2.) improper food handling whereas select individuals do not follow required health standards with respect to washing of ones hands upon entry into a restroom area (and subsequent exit) or any time after leaving the kitchen area. The fact that a man is homeless[2] and comes to a church looking for refuge does not transform into an inferior standard of food handling safety to which any UGM executive or chaplain would not deem acceptable for themselves as individuals.

5.    **Health Epidemic** - At first glance, there could be the temptation to believe "Health epidemic" overstates the reality; however, when a man code named "Cowboy" with which several of the chaplains are familiar, has a bout with diarrhea (see #4 above) only to clean and wipe his derriere with a pair of "Scrubs," provided by UGM, and then deposit the feces infested "Scrubs" into the general bin designated for laundering of bed

---

1    It is more than reasonable to assert the same whereas a man cares so little about himself to allow himself to fall into disrepair: going days if not weeks without a shower, longer without laundered clothing repeatedly worn everyday, unshaven for weeks, lesions on his body, whooping, coughing, and sneezing into general population air without a concern in the world, pants and clothing sagging below the waste line such as to reveal one's derriere, and an overall stench so bad as to promote nausea and vomiting merely from passing by one's space.

2    There is in fact a very distinct difference between 'homeless' and 'a bum.' Homelessness at its core originated as an economic issue. The state (whether or not immutable) of being 'a bum' is at its core a social issue which can and often does have various other touch-points but nonetheless its origin is a social issue.

linen – indeed – there exists a – health epidemic. This is a very serious issue which I suspect the Texas Health and Human Services would (or at least should) find to be a public health nuisance.

6.   **Health and Wellness** – While the Texas Health and Human services does require screening for TB on an annual basis, such is only a minimal standard and does not absolve UGM from ensuring that those who care little to nothing about their own health are not causing irreparable harm to the health of others who do care about their individual health and wellness. Case in point, there is absolutely no monitoring or enforcement, whatsoever, of cigarette/cigar/tobacco smoking/vaping on UGM grounds. It is so bad that smokers smoke and blow smoke everywhere without the slightest care in the world as to whether their choices have direct implications on others. They do. I cannot tolerate smoking of any kind and actively seek to avoid these individuals; however, they just follow around like zombies as if they can tell they annoy others and delight themselves in doing so. Furthermore, this recklessly managed smoking behavior, of UGM patrons, has caused a recent bout with bronchitis such that on December 9, 2019 I had to spend nearly a half day in the urgent care clinic amassing great medical expenses (regardless of whether or not covered by the county) which otherwise would not have incurred if not for UGM's failure to control this smoking behavior of UGM patrons. In short, this is a free country - if one chooses to die of lung cancer[3] smoking cigarettes that is his choice, but it is not mine and I need not be subjected to such destructive behavior[4] since UGM fails to control the same of its patrons.

Please understand, at least on paper, I respect the efforts UGM purports to support and the provisioning of bed space, and so forth pursuant thereto. At the same time, doing so does not, somehow, excuse UGM from addressing the above issues, both, on an incident level and on a program administration level. With respect to the latter, perhaps one thought worth consideration includes: ***How can UGM assist a large percentage of men causing these problems in a way that is most beneficial to society***? At least one such answer could be fact that **more than 80% of the patrons at UGM are unemployed**, which raises the question **why UGM is not assisting such individuals with employment**. UGM assisting, said individuals, with employment and education seems like a win-win and perhaps easy to 'stand up' as the State already has Workforce Opportunity Investment Act (hereinafter "WOIA") services available and funded

3   As a surviving child of a parent who passed away due to lung cancer for the very same reasons here i.e. smoking of tobacco (cigarettes), I have standing to state my disgust with cigarettes and the harm such tobacco products impose on society.

4   Let us keep in mind that to leave the UGM premises, in the morning hours, that occurs via UGM provided transportation via donated school buses. To obtain a ride via stated transportation one waits outside for the bus to arrive during which time it is virtually impossible to avoid the smokers following around blowing smoke everywhere right up to, and on occasion on the bus itself, here again outlining the problem with the un-managed reckless smoking behavior of UGM patrons.

through federal (reimbursed) dollars. So the solution – why not attach residency at UGM with something like WOIA education training for those patrons with little to no work experience and/or education? Furthermore, in many cases, even when an individual receives WOIA services, depending upon on a particular occupation, he could, also, receive on the job training whereas he could earn some type of wage (no matter how small or large) such that, overall, UGM could be a real partner[5] in rehabilitating, otherwise problematic individuals who have given up on life.

Of course the foregoing strategy is heavily contingent upon UGM considering who UGM is there to serve – UGM – via federal/state/ and private funding based upon "Homeless headcount" or rehabilitating the "Homeless headcount" individuals such as to get them back into society, as productive members, as soon as possible. In the event, such a (latter) solution causes one to cringe with fear as to the fate of UGM, if it were to actually 'rehabilitate' too many individuals – here is a thought – since UGM preaches everyday about the 'Gospel' why not practice what you preach i.e. have faith that something else would be around the corner for UGM, if in fact UGM were successful in the rehabilitation of all patrons. After all, per your own words – faith without works is dead – is it not?

Sincerely,



Darryl Carter

---

5  It would seem reasonable that UGM could use all the partners it could obtain especially since
   the church body for years has taken a nosedive in terms of headcount. And the millennial
   generation, has pointed to one of the problems with the church is the hypocrisy of the church
   itself, with a significant amount of 'unsavory behavior' occurring with regular church goers
   preaching the 'Gospel.' See article attached hereto.

⚡    Our 2020 Democratic Primary Polling Averages    ›



JOHN GREIM / LIGHTROCKET VIA GETTY IMAGES

DEC. 12, 2019, AT 6:00 AM

# Millennials Are Leaving Religion And Not Coming Back

By **Daniel Cox** and **Amelia Thomson-DeVeaux**

Filed under **Religion**

Millennials have earned a reputation for reshaping industries and institutions — shaking up the workplace, transforming dating culture, and rethinking parenthood. They've also had a dramatic impact on American religious life. Four in ten millennials now say they are religiously unaffiliated, according to the Pew Research Center. In fact, millennials (those between the ages of 23 and 38) are now almost as likely to say they have no religion as they are to identify as Christian. [1]

For a long time, though, it wasn't clear whether this youthful defection from religion would be temporary or permanent. It

seemed possible that as millennials grew older, at least some would return to a more traditional religious life. But there's mounting evidence that today's younger generations may be leaving religion for good.

Social science research has long suggested that Americans' relationship with religion has a tidal quality — people who were raised religious find themselves drifting away as young adults, only to be drawn back in when they find spouses and begin to raise their own families. Some argued that young adults just hadn't yet been pulled back into the fold of organized religion, especially since they were hitting major milestones like marriage and parenthood later on.

But now many millennials have spouses, children and mortgages — and there's little evidence of a corresponding surge in religious interest. A new national survey from the American Enterprise Institute of more than 2,500 Americans found a few reasons why millennials may not return to the religious fold. (One of the authors of this article helped conduct the survey.)

- For one thing, many millennials never had strong ties to religion to begin with, which means they were less likely to develop habits or associations that make it easier to return to a religious community.

- Young adults are also increasingly likely to have a spouse who is nonreligious, which may help reinforce their secular worldview.

- Changing views about the relationship between morality and religion also appear to have convinced many young parents that religious institutions are simply irrelevant or unnecessary for their children.

Millennials may be the symbols of a broader societal shift away from religion, but they didn't start it on their own. Their parents

are at least partly responsible for a widening generational gap in religious identity and beliefs; they were more likely than previous generations to raise their children without any connection to organized religion. According to the AEI survey, 17 percent of millennials said that they were not raised in any particular religion compared with only five percent of Baby Boomers. And fewer than one in three (32 percent) millennials say they attended weekly religious services with their family when they were young, compared with about half (49 percent) of Baby Boomers.

A parent's religious identity (or lack thereof) can do a lot to shape a child's religious habits and beliefs later in life. A 2016 Pew Research Center study found that regardless of the religion, those raised in households in which both parents shared the same religion still identified with that faith in adulthood. For instance, 84 percent of people raised by Protestant parents are still Protestant as adults. Similarly, people raised without religion are less apt to look for it as they grow older — that same Pew study found that 63 percent of people who grew up with two religiously unaffiliated parents were still nonreligious as adults.

But one finding in the survey signals that even millennials who grew up religious may be increasingly unlikely to return to religion. In the 1970s, most nonreligious Americans had a religious spouse and often, that partner would draw them back into regular religious practice. But now, a growing number of unaffiliated Americans are settling down with someone who isn't religious — a process that may have been accelerated by the sheer number of secular romantic partners available, and the rise of online dating. Today, 74 percent of unaffiliated millennials have a nonreligious partner or spouse, while only 26 percent have a partner who is religious.

Luke Olliff, a 30-year-old man living in Atlanta, says that he and his wife gradually shed their religious affiliations together. "My family thinks she convinced me to stop going to church and her

family thinks I was the one who convinced her," he said. "But really it was mutual. We moved to a city and talked a lot about how we came to see all of this negativity from people who were highly religious and increasingly didn't want a part in it." This view is common among young people. A majority (57 percent) of millennials agree that religious people are generally less tolerant of others, compared to only 37 percent of Baby Boomers.

Young adults like Olliff are also less likely to be drawn back to religion by another important life event — having children. For much of the country's history, religion was seen as an obvious resource for children's moral and ethical development. But many young adults no longer see religion as a necessary or even desirable component of parenting. Less than half (46 percent) of millennials believe it is necessary to believe in God to be moral. They're also much less likely than Baby Boomers to say that it's important for children to be brought up in a religion so they can learn good values (57 percent vs. 75 percent).

These attitudes are reflected in decisions about how young adults are raising their children. 45 percent of millennial parents say they take them to religious services and 39 percent say they send them to Sunday school or a religious education program. Baby Boomers, by contrast, were significantly more likely to send their children to Sunday school (61 percent) and to take them to church regularly (58 percent).

---

Mandie, a 32-year-old woman living in southern California and who asked that her last name not be used, grew up going to church regularly but is no longer religious. She told us she's not convinced a religious upbringing is what she'll choose for her one-year-old child. "My own upbringing was religious, but I've come to believe you can get important moral teachings outside religion," she said. "And in some ways I think many religious organizations are not good models for those teachings."

Why does it matter if millennials' rupture with religion turns out to be permanent? For one thing, religious involvement is associated with a wide variety of positive social outcomes like increased interpersonal trust and civic engagement that are hard to reproduce in other ways. And this trend has obvious political implications. As we wrote a few months ago, whether people are religious is increasingly tied to — and even driven by — their political identities. For years, the Christian conservative movement has warned about a tide of rising secularism, but research has suggested that the strong association between religion and the Republican Party may actually be fueling this divide. And if even more Democrats lose their faith, that will only exacerbate the acrimonious rift between secular liberals and religious conservatives.

"At that critical moment when people are getting married and having kids and their religious identity is becoming more stable, Republicans mostly do still return to religion — it's Democrats that aren't coming back," said Michele Margolis, author of "From the Politics to the Pews: How Partisanship and the Political Environment Shape Religious Identity." in an interview for our September story.

Of course, millennials' religious trajectory isn't set in stone — they may yet become more religious as they age. But it's easier to return to something familiar later in life than to try something completely new. And if millennials don't return to religion and instead begin raising a new generation with no religious background, the gulf between religious and secular America may grow even deeper.

---

**Footnotes**

1.

    For this analysis, we relied on the generational categories outlined by the Pew Research Center.

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ROBERT MARTIN; LAWRENCE LEE SMITH; ROBERT ANDERSON; JANET F. BELL; PAMELA S. HAWKES; and BASIL E. HUMPHREY, *Plaintiffs-Appellants*, | No. 15-35845 D.C. No. 1:09-cv-00540-REB |
| v. | |
| CITY OF BOISE, *Defendant-Appellee.* | OPINION |

Appeal from the United States District Court
for the District of Idaho
Ronald E. Bush, Chief Magistrate Judge, Presiding

Argued and Submitted July 13, 2017
Portland, Oregon

Filed September 4, 2018

Before: Marsha S. Berzon, Paul J. Watford,
and John B. Owens, Circuit Judges.

Opinion by Judge Berzon;
Partial Concurrence and Partial Dissent by Judge Owens

## SUMMARY[*]

### Civil Rights

The panel affirmed in part and reversed in part the district court's summary judgment in an action brought by six current or formerly homeless City of Boise residents who alleged that their citations under the City's Camping and Disorderly Conduct Ordinances violated the Eighth Amendment's prohibition on cruel and unusual punishment.

Plaintiffs sought damages for the alleged violations under 42 U.S.C. § 1983. Two plaintiffs also sought prospective declaratory and injunctive relief precluding future enforcement of the ordinances. In 2014, after this litigation began, the ordinances were amended to prohibit their enforcement against any homeless person on public property on any night when no shelter had an available overnight space.

The panel first held that two plaintiffs had standing to pursue prospective relief because they demonstrated a genuine issue of material fact as to whether they faced a credible risk of prosecution on a night when they had been denied access to the City's shelters. The panel noted that although the 2014 amendment precluded the City from enforcing the ordinances when shelters were full, individuals could still be turned away for reasons other than shelter capacity, such as for exceeding the shelter's stay limits, or for

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

failing to take part in a shelter's mandatory religious programs.

The panel held that although the doctrine set forth in *Heck v. Humphrey*, 512 U.S. 477 (1994) and its progeny precluded most — but not all — of the plaintiffs' requests for retrospective relief, the doctrine had no application to plaintiffs' request for an injunction enjoining prospective enforcement of the ordinances.

Turning to the merits, the panel held that the Cruel and Unusual Punishments Clause of the Eighth Amendment precluded the enforcement of a statute prohibiting sleeping outside against homeless individuals with no access to alternative shelter. The panel held that, as long as there is no option of sleeping indoors, the government cannot criminalize indigent, homeless people for sleeping outdoors, on public property, on the false premise they had a choice in the matter.

Concurring in part and dissenting in part, Judge Owens disagreed with the majority's opinion that *Heck v. Humphrey* did not bar plaintiffs' claim for declaratory and injunctive relief. Judge Owens stated that a declaration that the city ordinances are unconstitutional and an injunction against their future enforcement would necessarily demonstrate the invalidity of plaintiffs' prior convictions. Judge Owens otherwise joined the majority in full.

## COUNSEL

Michael E. Bern (argued) and Kimberly Leefatt, Latham &
Watkins LLP, Washington, D.C.; Howard A. Belodoff, Idaho
Legal Aid Services Inc., Boise, Idaho; Eric Tars, National
Law Center on Homelessness & Poverty, Washington, D.C.;
Plaintiffs-Appellants.

Brady J. Hall (argued), Michael W. Moore, and Steven R.
Kraft, Moore Elia Kraft & Hall LLP, Boise, Idaho; Scott B.
Muir, Deputy City Attorney; Robert B. Luce, City Attorney;
City Attorney's Office, Boise, Idaho; for Defendant-
Appellee.

## OPINION

BERZON, Circuit Judge:

> "The law, in its majestic equality, forbids rich
> and poor alike to sleep under bridges, to beg
> in the streets, and to steal their bread."

— Anatole France, *The Red Lily*

We consider whether the Eighth Amendment's
prohibition on cruel and unusual punishment bars a city from
prosecuting people criminally for sleeping outside on public
property when those people have no home or other shelter to
go to. We conclude that it does.

The plaintiffs-appellants are six current or former
residents of the City of Boise ("the City"), who are homeless
or have recently been homeless. Each plaintiff alleges that,

between 2007 and 2009, he or she was cited by Boise police for violating one or both of two city ordinances.  The first, Boise City Code § 9-10-02 (the "Camping Ordinance"), makes it a misdemeanor to use "any of the streets, sidewalks, parks, or public places as a camping place at any time."  The Camping Ordinance defines "camping" as "the use of public property as a temporary or permanent place of dwelling, lodging, or residence."  *Id.*  The second, Boise City Code § 6-01-05 (the "Disorderly Conduct Ordinance"), bans "[o]ccupying, lodging, or sleeping in any building, structure, or public place, whether public or private . . . without the permission of the owner or person entitled to possession or in control thereof."

All plaintiffs seek retrospective relief for their previous citations under the ordinances.  Two of the plaintiffs, Robert Anderson and Robert Martin, allege that they expect to be cited under the ordinances again in the future and seek declaratory and injunctive relief against future prosecution.

In *Jones v. City of Los Angeles*, 444 F.3d 1118, 1138 (9th Cir. 2006), *vacated*, 505 F.3d 1006 (9th Cir. 2007), a panel of this court concluded that "so long as there is a greater number of homeless individuals in Los Angeles than the number of available beds [in shelters]" for the homeless, Los Angeles could not enforce a similar ordinance against homeless individuals "for involuntarily sitting, lying, and sleeping in public."  *Jones* is not binding on us, as there was an underlying settlement between the parties and our opinion was vacated as a result.  We agree with *Jones*'s reasoning and central conclusion, however, and so hold that an ordinance violates the Eighth Amendment insofar as it imposes criminal sanctions against homeless individuals for sleeping outdoors, on public property, when no alternative shelter is available to

them.  Two of the plaintiffs, we further hold, may be entitled
to retrospective and prospective relief for violation of that
Eighth Amendment right.

## I. Background

The district court granted summary judgment to the City
on all claims.  We therefore review the record in the light
most favorable to the plaintiffs.  *Tolan v. Cotton*, 134 S. Ct.
1861, 1866 (2014).

Boise has a significant and increasing homeless
population.  According to the Point-in-Time Count ("PIT
Count") conducted by the Idaho Housing and Finance
Association, there were 753 homeless individuals in Ada
County — the county of which Boise is the seat — in January
2014, 46 of whom were "unsheltered," or living in places
unsuited to human habitation such as parks or sidewalks.  In
2016, the last year for which data is available, there were
867 homeless individuals counted in Ada County, 125 of
whom were unsheltered.[1]    The PIT Count likely
underestimates the number of homeless individuals in Ada

---

[1] The United States Department of Housing and Urban Development
("HUD") requires local homeless assistance and prevention networks to
conduct an annual count of homeless individuals on one night each
January, known as the PIT Count, as a condition of receiving federal
funds.  State, local, and federal governmental entities, as well as private
service providers, rely on the PIT Count as a "critical source of data" on
homelessness in the United States.  The parties acknowledge that the PIT
Count is not always precise.   The City's Director of Community
Partnerships, Diana Lachiondo, testified that the PIT Count is "not always
the . . . best resource for numbers," but also stated that "the point-in-time
count is our best snapshot" for counting the number of homeless
individuals in a particular region, and that she "cannot give . . . any other
number with any kind of confidence."

County. It is "widely recognized that a one-night point in time count will undercount the homeless population," as many homeless individuals may have access to temporary housing on a given night, and as weather conditions may affect the number of available volunteers and the number of homeless people staying at shelters or accessing services on the night of the count.

There are currently three homeless shelters in the City of Boise offering emergency shelter services, all run by private, nonprofit organizations. As far as the record reveals, these three shelters are the only shelters in Ada County.

One shelter — "Sanctuary" — is operated by Interfaith Sanctuary Housing Services, Inc. The shelter is open to men, women, and children of all faiths, and does not impose any religious requirements on its residents. Sanctuary has 96 beds reserved for individual men and women, with several additional beds reserved for families. The shelter uses floor mats when it reaches capacity with beds.

Because of its limited capacity, Sanctuary frequently has to turn away homeless people seeking shelter. In 2010, Sanctuary reached full capacity in the men's area "at least half of every month," and the women's area reached capacity "almost every night of the week." In 2014, the shelter reported that it was full for men, women, or both on 38% of nights. Sanctuary provides beds first to people who spent the previous night at Sanctuary. At 9:00 pm each night, it allots any remaining beds to those who added their names to the shelter's waiting list.

The other two shelters in Boise are both operated by the Boise Rescue Mission ("BRM"), a Christian nonprofit

organization. One of those shelters, the River of Life Rescue
Mission ("River of Life"), is open exclusively to men; the
other, the City Light Home for Women and Children ("City
Light"), shelters women and children only.

BRM's facilities provide two primary "programs" for the
homeless, the Emergency Services Program and the New Life
Discipleship Program.[2] The Emergency Services Program
provides temporary shelter, food, and clothing to anyone in
need. Christian religious services are offered to those seeking
shelter through the Emergency Services Program. The
shelters display messages and iconography on the walls, and
the intake form for emergency shelter guests includes a
religious message.[3]

Homeless individuals may check in to either BRM facility
between 4:00 and 5:30 pm. Those who arrive at BRM
facilities between 5:30 and 8:00 pm may be denied shelter,
depending on the reason for their late arrival; generally,
anyone arriving after 8:00 pm is denied shelter.

Except in winter, male guests in the Emergency Services
Program may stay at River of Life for up to 17 consecutive
nights; women and children in the Emergency Services
Program may stay at City Light for up to 30 consecutive

---

[2] The record suggests that BRM provides some limited additional
non-emergency shelter programming which, like the Discipleship
Program, has overtly religious components.

[3] The intake form states in relevant part that "We are a Gospel Rescue
Mission. Gospel means 'Good News,' and the Good News is that Jesus
saves us from sin past, present, and future. We would like to share the
Good News with you. Have you heard of Jesus? . . . Would you like to
know more about him?"

nights. After the time limit is reached, homeless individuals who do not join the Discipleship Program may not return to a BRM shelter for at least 30 days.[4] Participants in the Emergency Services Program must return to the shelter every night during the applicable 17-day or 30-day period; if a resident fails to check in to a BRM shelter each night, that resident is prohibited from staying overnight at that shelter for 30 days. BRM's rules on the length of a person's stay in the Emergency Services Program are suspended during the winter.

The Discipleship Program is an "intensive, Christ-based residential recovery program" of which "[r]eligious study is the very essence." The record does not indicate any limit to how long a member of the Discipleship Program may stay at a BRM shelter.

The River of Life shelter contains 148 beds for emergency use, along with 40 floor mats for overflow; 78 additional beds serve those in non-emergency shelter programs such as the Discipleship Program. The City Light shelter has 110 beds for emergency services, as well as 40 floor mats to handle overflow and 38 beds for women in non-emergency shelter programs. All told, Boise's three homeless shelters contain 354 beds and 92 overflow mats for homeless individuals.

## A. The Plaintiffs

Plaintiffs Robert Martin, Robert Anderson, Lawrence Lee Smith, Basil E. Humphrey, Pamela S. Hawkes, and Janet F.

---

[4] The parties dispute the extent to which BRM actually enforces the 17- and 30-day limits.

10                    MARTIN V. CITY OF BOISE

Bell are all homeless individuals who have lived in or around
Boise since at least 2007. Between 2007 and 2009, each
plaintiff was convicted at least once of violating the Camping
Ordinance, the Disorderly Conduct Ordinance, or both. With
one exception, all plaintiffs were sentenced to time served for
all convictions; on two occasions, Hawkes was sentenced to
one additional day in jail. During the same period, Hawkes
was cited, but not convicted, under the Camping Ordinance,
and Martin was cited, but not convicted, under the Disorderly
Conduct Ordinance.

    Plaintiff Robert Anderson currently lives in Boise; he is
homeless and has often relied on Boise's shelters for housing.
In the summer of 2007, Anderson stayed at River of Life as
part of the Emergency Services Program until he reached the
shelter's 17-day limit for male guests. Anderson testified that
during his 2007 stay at River of Life, he was required to
attend chapel services before he was permitted to eat dinner.
At the conclusion of his 17-day stay, Anderson declined to
enter the Discipleship Program because of his religious
beliefs. As Anderson was barred by the shelter's policies
from returning to River of Life for 30 days, he slept outside
for the next several weeks. On September 1, 2007, Anderson
was cited under the Camping Ordinance. He pled guilty to
violating the Camping Ordinance and paid a $25 fine; he did
not appeal his conviction.

    Plaintiff Robert Martin is a former resident of Boise who
currently lives in Post Falls, Idaho. Martin returns frequently
to Boise to visit his minor son. In March of 2009, Martin was
cited under the Camping Ordinance for sleeping outside; he
was cited again in 2012 under the same ordinance.

**B. Procedural History**

The plaintiffs filed this action in the United States District Court for the District of Idaho in October of 2009. All plaintiffs alleged that their previous citations under the Camping Ordinance and the Disorderly Conduct Ordinance violated the Cruel and Unusual Punishments Clause of the Eighth Amendment, and sought damages for those alleged violations under 42 U.S.C. § 1983. *Cf. Jones*, 444 F.3d at 1138. Anderson and Martin also sought prospective declaratory and injunctive relief precluding future enforcement of the ordinances under the same statute and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

After this litigation began, the Boise Police Department promulgated a new "Special Order," effective as of January 1, 2010, that prohibited enforcement of either the Camping Ordinance or the Disorderly Conduct Ordinance against any homeless person on public property on any night when no shelter had "an available overnight space." City police implemented the Special Order through a two-step procedure known as the "Shelter Protocol."

Under the Shelter Protocol, if any shelter in Boise reaches capacity on a given night, that shelter will so notify the police at roughly 11:00 pm. Each shelter has discretion to determine whether it is full, and Boise police have no other mechanism or criteria for gauging whether a shelter is full. Since the Shelter Protocol was adopted, Sanctuary has reported that it was full on almost 40% of nights. Although BRM agreed to the Shelter Protocol, its internal policy is never to turn any person away because of a lack of space, and neither BRM shelter has ever reported that it was full.

12                    MARTIN V. CITY OF BOISE

If all shelters are full on the same night, police are to refrain from enforcing either ordinance. Presumably because the BRM shelters have not reported full, Boise police continue to issue citations regularly under both ordinances.

In July 2011, the district court granted summary judgment to the City. It held that the plaintiffs' claims for retrospective relief were barred under the *Rooker-Feldman* doctrine and that their claims for prospective relief were mooted by the Special Order and the Shelter Protocol. *Bell v. City of Boise*, 834 F. Supp. 2d 1103 (D. Idaho 2011). On appeal, we reversed and remanded. *Bell v. City of Boise*, 709 F.3d 890, 901 (9th Cir. 2013). We held that the district court erred in dismissing the plaintiffs' claims under the *Rooker-Feldman* doctrine. *Id*. at 897. In so holding, we expressly declined to consider whether the favorable-termination requirement from *Heck v. Humphrey*, 512 U.S. 477 (1994), applied to the plaintiffs' claims for retrospective relief. Instead, we left the issue for the district court on remand. *Bell*, 709 F.3d at 897 n.11.

*Bell* further held that the plaintiffs' claims for prospective relief were not moot. The City had not met its "heavy burden" of demonstrating that the challenged conduct — enforcement of the two ordinances against homeless individuals with no access to shelter — "could not reasonably be expected to recur." *Id*. at 898, 901 (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)). We emphasized that the Special Order was a statement of administrative policy and so could be amended or reversed at any time by the Boise Chief of Police. *Id*. at 899–900.

Finally, *Bell* rejected the City's argument that the plaintiffs lacked standing to seek prospective relief because they were no longer homeless. *Id*. at 901 & n.12. We noted that, on summary judgment, the plaintiffs "need not establish that they in fact have standing, but only that there is a genuine issue of material fact as to the standing elements." *Id.* (citation omitted).

On remand, the district court again granted summary judgment to the City on the plaintiffs' § 1983 claims. The court observed that *Heck* requires a § 1983 plaintiff seeking damages for "harm caused by actions whose unlawfulness would render a conviction or sentence invalid" to demonstrate that "the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal . . . or called into question by a federal court's issuance of a writ of habeas corpus." 512 U.S. at 486–87. According to the district court, "a judgment finding the Ordinances unconstitutional . . . necessarily would imply the invalidity of Plaintiffs' [previous] convictions under those ordinances," and the plaintiffs therefore were required to demonstrate that their convictions or sentences had already been invalidated. As none of the plaintiffs had raised an Eighth Amendment challenge as a defense to criminal prosecution, nor had any plaintiff successfully appealed their conviction, the district court held that all of the plaintiffs' claims for retrospective relief were barred by *Heck*. The district court also rejected as barred by *Heck* the plaintiffs' claim for prospective injunctive relief under § 1983, reasoning that "a ruling in favor of Plaintiffs on even a prospective § 1983 claim would demonstrate the invalidity of any confinement stemming from those convictions."

14                    MARTIN V. CITY OF BOISE

Finally, the district court determined that, although *Heck*
did not bar relief under the Declaratory Judgment Act, Martin
and Anderson now lack standing to pursue such relief. The
linchpin of this holding was that the Camping Ordinance and
the Disorderly Conduct Ordinance were both amended in
2014 to codify the Special Order's mandate that "[l]aw
enforcement officers shall not enforce [the ordinances] when
the individual is on public property and there is no available
overnight shelter." Boise City Code §§ 6-01-05, 9-10-02.
Because the ordinances, as amended, permitted camping or
sleeping in a public place when no shelter space was
available, the court held that there was no "credible threat" of
future prosecution. "If the Ordinances are not to be enforced
when the shelters are full, those Ordinances do not inflict a
constitutional injury upon these particular plaintiffs . . . ."
The court emphasized that the record "suggests there is no
known citation of a homeless individual under the Ordinances
for camping or sleeping on public property on any night or
morning when he or she was unable to secure shelter due to
a lack of shelter capacity" and that "there has not been a
single night when all three shelters in Boise called in to report
they were simultaneously full for men, women or families."

This appeal followed.

## II. Discussion

### A. Standing

We first consider whether any of the plaintiffs has standing to pursue prospective relief.[5] We conclude that there are sufficient opposing facts in the record to create a genuine issue of material fact as to whether Martin and Anderson face a credible threat of prosecution under one or both ordinances in the future at a time when they are unable to stay at any Boise homeless shelter.[6]

"To establish Article III standing, an injury must be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (citation omitted). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes — that the injury is *certainly* impending." *Id*. (citation omitted). A plaintiff need not, however, await an arrest or prosecution to have standing to challenge the constitutionality of a criminal statute. "When the plaintiff has alleged an

---

[5] Standing to pursue retrospective relief is not in doubt. The only threshold question affecting the availability of a claim for retrospective relief — a question we address in the next section — is whether such relief is barred by the doctrine established in *Heck*.

[6] Although the SAC is somewhat ambiguous regarding which of the plaintiffs seeks prospective relief, counsel for the plaintiffs made clear at oral argument that only two of the plaintiffs, Martin and Anderson, seek such relief, and the district court considered the standing question with respect to Martin and Anderson only.

intention to engage in a course of conduct arguably affected
with a constitutional interest, but proscribed by a statute, and
there exists a credible threat of prosecution thereunder, he
should not be required to await and undergo a criminal
prosecution as the sole means of seeking relief." *Babbitt v.
United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)
(citation and internal quotation marks omitted). To defeat a
motion for summary judgment premised on an alleged lack of
standing, plaintiffs " need not establish that they in fact have
standing, but only that there is a genuine question of material
fact as to the standing elements." *Cent. Delta Water Agency
v. United States*, 306 F.3d 938, 947 (9th Cir. 2002).

In dismissing Martin and Anderson's claims for
declaratory relief for lack of standing, the district court
emphasized that Boise's ordinances, as amended in 2014,
preclude the City from issuing a citation when there is no
available space at a shelter, and there is consequently no risk
that either Martin or Anderson will be cited under such
circumstances in the future. Viewing the record in the light
most favorable to the plaintiffs, we cannot agree.

Although the 2014 amendments preclude the City from
enforcing the ordinances when there is no room available at
any shelter, the record demonstrates that the City is wholly
reliant on the shelters to self-report when they are full. It is
undisputed that Sanctuary is full as to men on a substantial
percentage of nights, perhaps as high as 50%. The City
nevertheless emphasizes that since the adoption of the Shelter
Protocol in 2010, the BRM facilities, River of Life and City
Light, have never reported that they are full, and BRM states
that it will never turn people away due to lack space.

The plaintiffs have pointed to substantial evidence in the record, however, indicating that whether or not the BRM facilities are ever full or turn homeless individuals away *for lack of space*, they *do* refuse to shelter homeless people who exhaust the number of days allotted by the facilities. Specifically, the plaintiffs allege, and the City does not dispute, that it is BRM's policy to limit men to 17 consecutive days in the Emergency Services Program, after which they cannot return to River of Life for 30 days; City Light has a similar 30-day limit for women and children. Anderson testified that BRM has enforced this policy against him in the past, forcing him to sleep outdoors.

The plaintiffs have adduced further evidence indicating that River of Life permits individuals to remain at the shelter after 17 days in the Emergency Services Program only on the condition that they become part of the New Life Discipleship program, which has a mandatory religious focus. For example, there is evidence that participants in the New Life Program are not allowed to spend days at Corpus Christi, a local Catholic program, "because it's . . . a different sect." There are also facts in dispute concerning whether the Emergency Services Program itself has a religious component. Although the City argues strenuously that the Emergency Services Program is secular, Anderson testified to the contrary; he stated that he was once required to attend chapel before being permitted to eat dinner at the River of Life shelter. Both Martin and Anderson have objected to the overall religious atmosphere of the River of Life shelter, including the Christian messaging on the shelter's intake form and the Christian iconography on the shelter walls. A city cannot, via the threat of prosecution, coerce an individual to attend religion-based treatment programs consistently with the Establishment Clause of the First Amendment. *Inouye v.*

18                MARTIN V. CITY OF BOISE

*Kemna*, 504 F.3d 705, 712–13 (9th Cir. 2007). Yet at the conclusion of a 17-day stay at River of Life, or a 30-day stay at City Light, an individual may be forced to choose between sleeping outside on nights when Sanctuary is full (and risking arrest under the ordinances), or enrolling in BRM programming that is antithetical to his or her religious beliefs.

The 17-day and 30-day limits are not the only BRM policies which functionally limit access to BRM facilities even when space is nominally available. River of Life also turns individuals away if they voluntarily leave the shelter before the 17-day limit and then attempt to return within 30 days. An individual who voluntarily leaves a BRM facility for any reason — perhaps because temporary shelter is available at Sanctuary, or with friends or family, or in a hotel — cannot immediately return to the shelter if circumstances change. Moreover, BRM's facilities may deny shelter to any individual who arrives after 5:30 pm, and generally will deny shelter to anyone arriving after 8:00 pm. Sanctuary, however, does not assign beds to persons on its waiting list until 9:00 pm. Thus, by the time a homeless individual on the Sanctuary waiting list discovers that the shelter has no room available, it may be too late to seek shelter at either BRM facility.

So, even if we credit the City's evidence that BRM's facilities have never been "full," and that the City has never cited any person under the ordinances who could not obtain shelter "due to a lack of shelter capacity," there remains a genuine issue of material fact as to whether homeless individuals in Boise run a credible risk of being issued a citation on a night when Sanctuary is full and they have been denied entry to a BRM facility for reasons other than shelter capacity. If so, then as a practical matter, no shelter is

MARTIN V. CITY OF BOISE                    19

available. We note that despite the Shelter Protocol and the amendments to both ordinances, the City continues regularly to issue citations for violating both ordinances; during the first three months of 2015, the Boise Police Department issued over 175 such citations.

The City argues that Martin faces little risk of prosecution under either ordinance because he has not lived in Boise since 2013. Martin states, however, that he is still homeless and still visits Boise several times a year to visit his minor son, and that he has continued to seek shelter at Sanctuary and River of Life. Although Martin may no longer spend enough time in Boise to risk running afoul of BRM's 17-day limit, he testified that he has unsuccessfully sought shelter at River of Life after being placed on Sanctuary's waiting list, only to discover later in the evening that Sanctuary had no available beds. Should Martin return to Boise to visit his son, there is a reasonable possibility that he might again seek shelter at Sanctuary, only to discover (after BRM has closed for the night) that Sanctuary has no space for him. Anderson, for his part, continues to live in Boise and states that he remains homeless.

We conclude that both Martin and Anderson have demonstrated a genuine issue of material fact regarding whether they face a credible risk of prosecution under the ordinances in the future on a night when they have been denied access to Boise's homeless shelters; both plaintiffs therefore have standing to seek prospective relief.

## B. *Heck v. Humphrey*

We turn next to the impact of *Heck v. Humphrey* and its progeny on this case. With regard to retrospective relief, the

plaintiffs maintain that *Heck* should not bar their claims because, with one exception, all of the plaintiffs were sentenced to time served.**[7]**   It would therefore have been impossible for the plaintiffs to obtain federal habeas relief, as any petition for a writ of habeas corpus must be filed while the petitioner is "in custody pursuant to the judgment of a State court." *See* 28 U.S.C. § 2254(a); *Spencer v. Kemna*, 523 U.S. 1, 7, 17–18 (1998).   With regard to prospective relief, the plaintiffs emphasize that they seek only equitable protection against *future* enforcement of an allegedly unconstitutional statute, and not to invalidate any prior conviction under the same statute.   We hold that although the *Heck* line of cases precludes most — but not all — of the plaintiffs' requests for retrospective relief, that doctrine has no application to the plaintiffs' request for an injunction enjoining prospective enforcement of the ordinances.

### 1.  The *Heck* Doctrine

A long line of Supreme Court case law, beginning with *Preiser v. Rodriguez*, 411 U.S. 475 (1973), holds that a prisoner in state custody cannot use a § 1983 action to challenge the fact or duration of his or her confinement, but must instead seek federal habeas corpus relief or analogous state relief. *Id.* at 477, 500.   *Preiser* considered whether a prison inmate could bring a § 1983 action seeking an injunction to remedy an unconstitutional deprivation of good-time conduct credits.   Observing that habeas corpus is the traditional instrument to obtain release from unlawful

---

**[7]** Plaintiff Pamela Hawkes was convicted of violating the Camping Ordinance or Disorderly Conduct Ordinance on twelve occasions; although she was usually sentenced to time served, she was twice sentenced to one additional day in jail.

confinement, *Preiser* recognized an implicit exception from
§ 1983's broad scope for actions that lie "within the core of
habeas corpus" — specifically, challenges to the "fact or
duration" of confinement. *Id*. at 487, 500. The Supreme
Court subsequently held, however, that although *Preiser*
barred inmates from obtaining an injunction to restore good-
time credits via a § 1983 action, *Preiser* did not "preclude a
litigant with standing from obtaining by way of ancillary
relief an otherwise proper injunction enjoining the
*prospective* enforcement of invalid prison regulations." *Wolff
v. McDonnell*, 418 U.S. 539, 555 (1974) (emphasis added).

   *Heck* addressed a § 1983 action brought by an inmate
seeking compensatory and punitive damages. The inmate
alleged that state and county officials had engaged in
unlawful investigations and knowing destruction of
exculpatory evidence. *Heck*, 512 U.S. at 479. The Court in
*Heck* analogized a § 1983 action of this type, which called
into question the validity of an underlying conviction, to a
cause of action for malicious prosecution, *id.* at 483–84, and
went on to hold that, as with a malicious prosecution claim,
a plaintiff in such an action must demonstrate a favorable
termination of the criminal proceedings before seeking tort
relief, *id*. at 486–87. "[T]o recover damages for allegedly
unconstitutional conviction or imprisonment, or for other
harm caused by actions whose unlawfulness would render a
conviction or sentence invalid, a § 1983 plaintiff must prove
that the conviction or sentence has been reversed on direct
appeal, expunged by executive order, declared invalid by a
state tribunal authorized to make such determination, or
called into question by a federal court's issuance of a writ of
habeas corpus." *Id*.

*Edwards v. Balisok*, 520 U.S. 641 (1997) extended *Heck*'s holding to claims for declaratory relief. *Id.* at 648. The plaintiff in *Edwards* alleged that he had been deprived of earned good-time credits without due process of law, because the decisionmaker in disciplinary proceedings had concealed exculpatory evidence. Because the plaintiff's claim for declaratory relief was "based on allegations of deceit and bias on the part of the decisionmaker that necessarily imply the invalidity of the punishment imposed," *Edwards* held, it was "not cognizable under § 1983." *Id*. *Edwards* went on to hold, however, that a requested injunction requiring prison officials to date-stamp witness statements was not *Heck*-barred, reasoning that a "prayer for such *prospective* relief will not 'necessarily imply' the invalidity of a previous loss of good-time credits, and so may properly be brought under § 1983." *Id*. (emphasis added).

Most recently, *Wilkinson v. Dotson*, 544 U.S. 74 (2005), stated that *Heck* bars § 1983 suits even when the relief sought is prospective injunctive or declaratory relief, "if success in that action would necessarily demonstrate the invalidity of confinement or its duration." *Id.* at 81–82 (emphasis omitted). But *Wilkinson* held that the plaintiffs in that case *could* seek a prospective injunction compelling the state to comply with constitutional requirements in parole proceedings in the future. The Court observed that the prisoners' claims for future relief, "if successful, will not necessarily imply the invalidity of confinement or shorten its duration." *Id*. at 82.

The Supreme Court did not, in these cases or any other, conclusively determine whether *Heck'*s favorable-termination requirement applies to convicts who have no practical opportunity to challenge their conviction or sentence via a

petition for habeas corpus.  *See Muhammad v. Close*, 540 U.S. 749, 752 & n.2 (2004).  But in *Spencer*, five Justices suggested that *Heck* may not apply in such circumstances. *Spencer*, 523 U.S. at 3.

The petitioner in *Spencer* had filed a federal habeas petition seeking to invalidate an order revoking his parole. While the habeas petition was pending, the petitioner's term of imprisonment expired, and his habeas petition was consequently dismissed as moot.  Justice Souter wrote a concurring opinion in which three other Justices joined, addressing the petitioner's argument that if his habeas petition were mooted by his release, any § 1983 action would be barred under *Heck*, yet he would no longer have access to a federal habeas forum to challenge the validity of his parole revocation.  *Id*. at 18–19 (Souter, J., concurring).  Justice Souter stated that in his view "*Heck* has no such effect," and that "a former prisoner, no longer 'in custody,' may bring a § 1983 action establishing the unconstitutionality of a conviction or confinement without being bound to satisfy a favorable-termination requirement that it would be impossible as a matter of law for him to satisfy."  *Id*. at 21. Justice Stevens, dissenting, stated that he would have held the habeas petition in *Spencer* not moot, but agreed that "[g]iven the Court's holding that petitioner does not have a remedy under the habeas statute, it is perfectly clear . . . that he may bring an action under 42 U.S.C. § 1983."  *Id*. at 25 n.8 (Stevens, J., dissenting).

Relying on the concurring and dissenting opinions in *Spencer*, we have held that the "unavailability of a remedy in habeas corpus because of mootness" permitted a plaintiff released from custody to maintain a § 1983 action for damages, "even though success in that action would imply the

invalidity of the disciplinary proceeding that caused revocation of his good-time credits." *Nonnette v. Small*, 316 F.3d 872, 876 (9th Cir. 2002). But we have limited *Nonnette* in recent years. Most notably, we held in *Lyall v. City of Los Angeles*, 807 F.3d 1178 (9th Cir. 2015), that even where a plaintiff had no practical opportunity to pursue federal habeas relief while detained because of the short duration of his confinement, *Heck* bars a § 1983 action that would imply the invalidity of a prior conviction if the plaintiff could have sought invalidation of the underlying conviction via direct appeal or state post-conviction relief, but did not do so. *Id*. at 1192 & n.12.

## 2. Retrospective Relief

Here, the majority of the plaintiffs' claims for *retrospective* relief are governed squarely by *Lyall.* It is undisputed that all the plaintiffs not only failed to challenge their convictions on direct appeal but expressly waived the right to do so as a condition of their guilty pleas. The plaintiffs have made no showing that any of their convictions were invalidated via state post-conviction relief. We therefore hold that all but two of the plaintiffs' claims for damages are foreclosed under *Lyall.*

Two of the plaintiffs, however, Robert Martin and Pamela Hawkes, also received citations under the ordinances that were dismissed before the state obtained a conviction. Hawkes was cited for violating the Camping Ordinance on July 8, 2007; that violation was dismissed on August 28, 2007. Martin was cited for violating the Disorderly Conduct Ordinance on April 24, 2009; those charges were dismissed on September 9, 2009. With respect to these two incidents, the district court erred in finding that the plaintiffs' Eighth

Amendment challenge was barred by *Heck*. Where there is no "conviction or sentence" that may be undermined by a grant of relief to the plaintiffs, the *Heck* doctrine has no application. 512 U.S. at 486–87; *see also Wallace v. Kato*, 549 U.S. 384, 393 (2007).

Relying on *Ingraham v. Wright*, 430 U.S. 651, 664 (1977), the City argues that the Eighth Amendment, and the Cruel and Unusual Punishments Clause in particular, have no application where there has been no conviction. The City's reliance on *Ingraham* is misplaced. As the Supreme Court observed in *Ingraham*, the Cruel and Unusual Punishments Clause not only limits the types of punishment that may be imposed and prohibits the imposition of punishment grossly disproportionate to the severity of the crime, but also "imposes substantive limits on what can be made criminal and punished as such." *Id*. at 667. "This [latter] protection governs the criminal law process as a whole, not only the imposition of punishment postconviction." *Jones*, 444 F.3d at 1128.

*Ingraham* concerned only whether "impositions outside the criminal process" — in that case, the paddling of schoolchildren — "constituted cruel and unusual punishment." 430 U.S. at 667. *Ingraham* did not hold that a plaintiff challenging the state's power to criminalize a particular status or conduct in the first instance, as the plaintiffs in this case do, must first be convicted. If conviction were a prerequisite for such a challenge, "the state could in effect punish individuals in the preconviction stages of the criminal law enforcement process for being or doing things that under the [Cruel and Unusual Punishments Clause] cannot be subject to the criminal process." *Jones*, 444 F.3d at 1129. For those rare Eighth Amendment

challenges concerning the state's very power to criminalize
particular behavior or status, then, a plaintiff need
demonstrate only the initiation of the criminal process against
him, not a conviction.

### 3.  Prospective Relief

The district court also erred in concluding that the
plaintiffs' requests for prospective injunctive relief were
barred by *Heck.* The district court relied entirely on language
in *Wilkinson* stating that "a state prisoner's § 1983 action is
barred (absent prior invalidation) . . . no matter the relief
sought (damages or equitable relief) . . . *if* success in that
action would necessarily demonstrate the invalidity of
confinement or its duration." *Wilkinson*, 544 U.S. at 81–82.
The district court concluded from this language in *Wilkinson*
that a person convicted under an allegedly unconstitutional
statute may never challenge the validity or application of that
statute after the initial criminal proceeding is complete, even
when the relief sought is prospective only and independent of
the prior conviction.  The logical extension of the district
court's interpretation is that an individual who does not
successfully invalidate a first conviction under an
unconstitutional statute will have no opportunity to challenge
that statute prospectively so as to avoid arrest and conviction
for violating that same statute in the future.

Neither *Wilkinson* nor any other case in the *Heck* line
supports such a result.  Rather, *Wolff*, *Edwards*, and
*Wilkinson* compel the opposite conclusion.

*Wolff* held that although *Preiser* barred a § 1983 action
seeking restoration of good-time credits absent a successful
challenge in federal habeas proceedings, *Preiser* did not

"preclude a litigant with standing from obtaining by way of ancillary relief an otherwise proper injunction enjoining the prospective enforcement of invalid . . . regulations." *Wolff*, 418 U.S. at 555. Although *Wolff* was decided before *Heck*, the Court subsequently made clear that *Heck* effected no change in the law in this regard, observing in *Edwards* that "[o]rdinarily, a prayer for . . . prospective [injunctive] relief will not 'necessarily imply' the invalidity of a *previous* loss of good-time credits, and so may properly be brought under § 1983." *Edwards*, 520 U.S. at 648 (emphasis added). Importantly, the Court held in *Edwards* that although the plaintiff could not, consistently with *Heck*, seek a declaratory judgment stating that the procedures employed by state officials that deprived him of good-time credits were unconstitutional, he *could* seek an injunction barring such allegedly unconstitutional procedures in the future. *Id*. Finally, the Court noted in *Wilkinson* that the *Heck* line of cases "has focused on the need to ensure that state prisoners use only habeas corpus (or similar state) remedies *when they seek to invalidate the duration of their confinement*," *Wilkinson*, 544 U.S. at 81 (emphasis added), alluding to an existing confinement, not one yet to come.

The *Heck* doctrine, in other words, serves to ensure the finality and validity of previous convictions, not to insulate future prosecutions from challenge. In context, it is clear that *Wilkinson*'s holding that the *Heck* doctrine bars a § 1983 action "no matter the relief sought (damages or equitable relief) . . . if success in that action would necessarily demonstrate the invalidity of confinement or its duration" applies to equitable relief concerning an existing confinement, not to suits seeking to preclude an unconstitutional confinement in the future, arising from incidents occurring after any prior conviction and stemming

from a possible later prosecution and conviction. *Id*. at 81–82 (emphasis added). As *Wilkinson* held, "claims for *future* relief (which, if successful, will not necessarily imply the invalidity of confinement or shorten its duration)" are distant from the "core" of habeas corpus with which the *Heck* line of cases is concerned, and are not precluded by the *Heck* doctrine. *Id*. at 82.

In sum, we hold that the majority of the plaintiffs' claims for retrospective relief are barred by *Heck*, but both Martin and Hawkes stated claims for damages to which *Heck* has no application. We further hold that *Heck* has no application to the plaintiffs' requests for prospective injunctive relief.

## C. The Eighth Amendment

At last, we turn to the merits — does the Cruel and Unusual Punishments Clause of the Eighth Amendment preclude the enforcement of a statute prohibiting sleeping outside against homeless individuals with no access to alternative shelter? We hold that it does, for essentially the same reasons articulated in the now-vacated *Jones* opinion.

The Eighth Amendment states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const., amend. VIII. The Cruel and Unusual Punishments Clause "circumscribes the criminal process in three ways." *Ingraham*, 430 U.S. at 667. First, it limits the type of punishment the government may impose; second, it proscribes punishment "grossly disproportionate" to the severity of the crime; and third, it places substantive limits on what the government may criminalize. *Id.* It is the third limitation that is pertinent here.

"Even one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold." *Robinson v. California*, 370 U.S. 660, 667 (1962).  Cases construing substantive limits as to what the government may criminalize are rare, however, and for good reason — the Cruel and Unusual Punishments Clause's third limitation is "one to be applied sparingly." *Ingraham*, 430 U.S. at 667.

*Robinson*, the seminal case in this branch of Eighth Amendment jurisprudence, held a California statute that "ma[de] the 'status' of narcotic addiction a criminal offense" invalid under the Cruel and Unusual Punishments Clause. 370 U.S. at 666.  The California law at issue in *Robinson* was "not one which punishe[d] a person for the use of narcotics, for their purchase, sale or possession, or for antisocial or disorderly behavior resulting from their administration"; it punished addiction itself.  *Id*.  Recognizing narcotics addiction as an illness or disease — "apparently an illness which may be contracted innocently or involuntarily" — and observing that a "law which made a criminal offense of . . . a disease would doubtless be universally thought to be an infliction of cruel and unusual punishment," *Robinson* held the challenged statute a violation of the Eighth Amendment. *Id*. at 666–67.

As *Jones* observed, *Robinson* did not explain at length the principles underpinning its holding.  *See Jones*, 444 F.3d at 1133.  In *Powell v. Texas*, 392 U.S. 514 (1968), however, the Court elaborated on the principle first articulated in *Robinson*.

*Powell* concerned the constitutionality of a Texas law making public drunkenness a criminal offense.  Justice Marshall, writing for a plurality of the Court, distinguished the Texas statute from the law at issue in *Robinson* on the

30                MARTIN V. CITY OF BOISE

ground that the Texas statute made criminal not alcoholism
but *conduct* — appearing in public while intoxicated.
"[A]ppellant was convicted, not for being a chronic alcoholic,
but for being in public while drunk on a particular occasion.
The State of Texas thus has not sought to punish a mere
status, as California did in *Robinson*; nor has it attempted to
regulate appellant's behavior in the privacy of his own
home." *Id*. at 532 (plurality opinion).

The *Powell* plurality opinion went on to interpret
*Robinson* as precluding only the criminalization of "status,"
not of "involuntary" conduct.    "The entire thrust of
*Robinson*'s interpretation of the Cruel and Unusual
Punishment Clause is that criminal penalties may be inflicted
only if the accused has committed some act, has engaged in
some behavior, which society has an interest in preventing, or
perhaps in historical common law terms, has committed some
actus reus.   It thus does not deal with the question of whether
certain conduct cannot constitutionally be punished because
it is, in some sense, 'involuntary' . . . ." *Id*. at 533.

Four Justices dissented from the Court's holding in
*Powell*; Justice White concurred in the result alone.  Notably,
Justice White noted that many chronic alcoholics are also
homeless, and that for those individuals, public drunkenness
may be unavoidable as a practical matter.  "For all practical
purposes the public streets may be home for these
unfortunates, not because their disease compels them to be
there, but because, drunk or sober, they have no place else to
go and no place else to be when they are drinking. . . . For
some of these alcoholics I would think a showing could be
made that resisting drunkenness is impossible and that
avoiding public places when intoxicated is also impossible.
As applied to them this statute is in effect a law which bans

a single act for which they may not be convicted under the Eighth Amendment — the act of getting drunk." *Id*. at 551 (White, J., concurring in the judgment).

The four dissenting Justices adopted a position consistent with that taken by Justice White: that under *Robinson*, "criminal penalties may not be inflicted upon a person for being in a condition he is powerless to change," and that the defendant, "once intoxicated, . . . could not prevent himself from appearing in public places." *Id*. at 567 (Fortas, J., dissenting). Thus, five Justices gleaned from *Robinson* the principle that "that the Eighth Amendment prohibits the state from punishing an involuntary act or condition if it is the unavoidable consequence of one's status or being." *Jones*, 444 F.3d at 1135; *see also United States v. Roberston*, 875 F.3d 1281, 1291 (9th Cir. 2017).

This principle compels the conclusion that the Eighth Amendment prohibits the imposition of criminal penalties for sitting, sleeping, or lying outside on public property for homeless individuals who cannot obtain shelter. As *Jones* reasoned, "[w]hether sitting, lying, and sleeping are defined as acts or conditions, they are universal and unavoidable consequences of being human." *Jones*, 444 F.3d at 1136. Moreover, any "conduct at issue here is involuntary and inseparable from status — they are one and the same, given that human beings are biologically compelled to rest, whether by sitting, lying, or sleeping." *Id.* As a result, just as the state may not criminalize the state of being "homeless in public places," the state may not "criminalize conduct that is an unavoidable consequence of being homeless — namely sitting, lying, or sleeping on the streets." *Id*. at 1137.

Our holding is a narrow one. Like the *Jones* panel, "we
in no way dictate to the City that it must provide sufficient
shelter for the homeless, or allow anyone who wishes to sit,
lie, or sleep on the streets . . . at any time and at any place."
*Id*. at 1138. We hold only that "so long as there is a greater
number of homeless individuals in [a jurisdiction] than the
number of available beds [in shelters]," the jurisdiction
cannot prosecute homeless individuals for "involuntarily
sitting, lying, and sleeping in public." *Id*. That is, as long as
there is no option of sleeping indoors, the government cannot
criminalize indigent, homeless people for sleeping outdoors,
on public property, on the false premise they had a choice in
the matter.**[8]**

We are not alone in reaching this conclusion. As one
court has observed, "resisting the need to eat, sleep or engage
in other life-sustaining activities is impossible. Avoiding
public places when engaging in this otherwise innocent
conduct is also impossible. . . . As long as the homeless
plaintiffs do not have a single place where they can lawfully
be, the challenged ordinances, as applied to them, effectively

---

**[8]** Naturally, our holding does not cover individuals who *do* have
access to adequate temporary shelter, whether because they have the
means to pay for it or because it is realistically available to them for free,
but who choose not to use it. Nor do we suggest that a jurisdiction with
insufficient shelter can *never* criminalize the act of sleeping outside. Even
where shelter is unavailable, an ordinance prohibiting sitting, lying, or
sleeping outside at particular times or in particular locations might well be
constitutionally permissible. *See Jones*, 444 F.3d at 1123. So, too, might
an ordinance barring the obstruction of public rights of way or the erection
of certain structures. Whether some other ordinance is consistent with the
Eighth Amendment will depend, as here, on whether it punishes a person
for lacking the means to live out the "universal and unavoidable
consequences of being human" in the way the ordinance prescribes. *Id.*
at 1136.

punish them for something for which they may not be convicted under the [E]ighth [A]mendment — sleeping, eating and other innocent conduct." *Pottinger v. City of Miami*, 810 F. Supp. 1551, 1565 (S.D. Fla. 1992); *see also Johnson v. City of Dallas*, 860 F. Supp. 344, 350 (N.D. Tex. 1994) (holding that a "sleeping in public ordinance as applied against the homeless is unconstitutional"), *rev'd on other grounds*, 61 F.3d 442 (5th Cir. 1995).[9]

Here, the two ordinances criminalize the simple act of sleeping outside on public property, whether bare or with a blanket or other basic bedding. The Disorderly Conduct Ordinance, on its face, criminalizes "[o]ccupying, lodging, or sleeping in *any* building, structure or place, whether public or private" without permission. Boise City Code § 6-01-05. Its scope is just as sweeping as the Los Angeles ordinance at issue in *Jones*, which mandated that "[n]o person shall sit, lie or sleep in or upon any street, sidewalk or other public way." 444 F.3d at 1123.

The Camping Ordinance criminalizes using "any of the streets, sidewalks, parks or public places as a camping place

---

[9] In  *Joel v. City of Orlando*, 232 F.3d 1353, 1362 (11th Cir. 2000), the Eleventh Circuit upheld an anti-camping ordinance similar to Boise's against an Eighth Amendment challenge. In *Joel*, however, the defendants presented unrefuted evidence that the homeless shelters in the City of Orlando had never reached capacity and that the plaintiffs had always enjoyed access to shelter space. *Id*. Those unrefuted facts were critical to the court's holding. *Id*. As discussed below, the plaintiffs here have demonstrated a genuine issue of material fact concerning whether they have been denied access to shelter in the past or expect to be so denied in the future. *Joel* therefore does not provide persuasive guidance for this case.

34                    MARTIN V. CITY OF BOISE

at any time."  Boise City Code § 9-10-02.  The ordinance
defines "camping" broadly:

> The term "camp" or "camping" shall mean the
> use of public property as a temporary or
> permanent place of dwelling, lodging, or
> residence, or as a living accommodation at
> anytime between sunset and sunrise, or as a
> sojourn. Indicia of camping may include, but
> are not limited to, storage of personal
> belongings, using tents or other temporary
> structures for sleeping or storage of personal
> belongings, carrying on cooking activities or
> making any fire in an unauthorized area, or
> any of these activities in combination with
> one another or in combination with either
> sleeping or making preparations to sleep
> (including the laying down of bedding for the
> purpose of sleeping).

*Id.*  It appears from the record that the Camping Ordinance is
frequently enforced against homeless individuals with some
elementary bedding, whether or not any of the other listed
indicia of "camping" — the erection of temporary structures,
the activity of cooking or making fire, or the storage of
personal property — are present.  For example, a Boise police
officer testified that he cited plaintiff Pamela Hawkes under
the Camping Ordinance for sleeping outside "wrapped in a
blanket with her sandals off and next to her," for sleeping in
a public restroom "with blankets," and for sleeping in a park
"on a blanket, wrapped in blankets on the ground."  The
Camping Ordinance therefore can be, and allegedly is,
enforced against homeless individuals who take even the
most rudimentary precautions to protect themselves from the

elements. We conclude that a municipality cannot criminalize such behavior consistently with the Eighth Amendment when no sleeping space is practically available in any shelter.

### III. Conclusion

For the foregoing reasons, we **AFFIRM** the judgment of the district court as to the plaintiffs' requests for retrospective relief, except as such claims relate to Hawkes's July 2007 citation under the Camping Ordinance and Martin's April 2009 citation under the Disorderly Conduct Ordinance. We **REVERSE** and **REMAND** with respect to the plaintiffs' requests for prospective relief, both declaratory and injunctive, and to the plaintiffs' claims for retrospective relief insofar as they relate to Hawkes' July 2007 citation or Martin's April 2009 citation.[10]

---

[10] Costs shall be awarded to the plaintiffs.

OWENS, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that the doctrine of *Heck v. Humphrey*, 512 U.S. 477 (1994), bars the plaintiffs' 42 U.S.C. § 1983 claims for damages that are based on convictions that have not been challenged on direct appeal or invalidated in state post-conviction relief. *See Lyall v. City of Los Angeles*, 807 F.3d 1178, 1192 n.12 (9th Cir. 2015).

I also agree that *Heck* and its progeny have no application where there is no "conviction or sentence" that would be undermined by granting a plaintiff's request for relief under § 1983. *Heck*, 512 U.S. at 486–87; *see also Wallace v. Kato*, 549 U.S. 384, 393 (2007). I therefore concur in the majority's conclusion that *Heck* does not bar plaintiffs Robert Martin and Pamela Hawkes from seeking retrospective relief for the two instances in which they received citations, but not convictions. I also concur in the majority's Eighth Amendment analysis as to those two claims for retrospective relief.

Where I part ways with the majority is in my understanding of *Heck*'s application to the plaintiffs' claims for declaratory and injunctive relief. In *Wilkinson v. Dotson*, 544 U.S. 74 (2005), the Supreme Court explained where the *Heck* doctrine stands today:

> [A] state prisoner's § 1983 action is barred (absent prior invalidation)—no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings)—*if* success in that action

> would necessarily demonstrate the invalidity
> of confinement or its duration.

*Id.* at 81–82. Here, the majority acknowledges this language in *Wilkinson*, but concludes that *Heck*'s bar on any type of relief that "would necessarily demonstrate the invalidity of confinement" does not preclude the prospective claims at issue. The majority reasons that the purpose of *Heck* is "to ensure the finality and validity of previous convictions, not to insulate future prosecutions from challenge," and so concludes that the plaintiffs' prospective claims may proceed. I respectfully disagree.

A declaration that the city ordinances are unconstitutional and an injunction against their future enforcement necessarily demonstrate the invalidity of the plaintiffs' prior convictions. Indeed, any time an individual challenges the constitutionality of a substantive criminal statute under which he has been convicted, he asks for a judgment that would necessarily demonstrate the invalidity of his conviction. And though neither the Supreme Court nor this court has squarely addressed *Heck*'s application to § 1983 claims challenging the constitutionality of a substantive criminal statute, I believe *Edwards v. Balisok*, 520 U.S. 641 (1997), makes clear that *Heck* prohibits such challenges. In *Edwards*, the Supreme Court explained that although our court had recognized that *Heck* barred § 1983 claims challenging the validity of a prisoner's confinement "as a substantive matter," it improperly distinguished as not *Heck*-barred *all* claims alleging only procedural violations. 520 U.S. at 645. In holding that *Heck* also barred those procedural claims that would necessarily imply the invalidity of a conviction, the Court did not question our conclusion that claims challenging a conviction "as a substantive matter" are barred by *Heck*.

*Id.*; *see also Wilkinson*, 544 U.S. at 82 (holding that the plaintiffs' claims could proceed because the relief requested would only "render invalid the state *procedures*" and "a favorable judgment [would] not 'necessarily imply the invalidity of [their] conviction[s] or sentence[s]'" (emphasis added) (quoting *Heck*, 512 U.S. at 487)).

*Edwards* thus leads me to conclude that an individual who was convicted under a criminal statute, but who did not challenge the constitutionality of the statute at the time of his conviction through direct appeal or post-conviction relief, cannot do so in the first instance by seeking declaratory or injunctive relief under § 1983. *See Abusaid v. Hillsborough Cty. Bd. of Cty. Comm'rs*, 405 F.3d 1298, 1316 n.9 (11th Cir. 2005) (assuming that a §1983 claim challenging "the constitutionality of the ordinance under which [the petitioner was convicted]" would be *Heck*-barred). I therefore would hold that *Heck* bars the plaintiffs' claims for declaratory and injunctive relief.

We are not the first court to struggle applying *Heck* to "real life examples," nor will we be the last. *See, e.g.*, *Spencer v. Kemna*, 523 U.S. 1, 21 (1998) (Ginsburg, J., concurring) (alterations and internal quotation marks omitted) (explaining that her thoughts on *Heck* had changed since she joined the majority opinion in that case). If the slate were blank, I would agree that the majority's holding as to prospective relief makes good sense. But because I read *Heck* and its progeny differently, I dissent as to that section of the majority's opinion. I otherwise join the majority in full.